# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Commitment of Trulock*, 2012 IL App (3d) 110550

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF JEREMY TRULOCK (The People of the State of Illinois, Petitioner-Appellee, v. Jeremy Trulock, Respondent-Appellant). |
| District & No. | Third District<br>Docket No. 3-11-0550 |
| Filed | June 6, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's finding that respondent was a sexually violent person and his commitment to a secure facility for institutional care were upheld on appeal, notwithstanding defendant's contentions that the trial court erred in denying his motion to dismiss the commitment petition on the ground that a probable cause hearing was not held within 72 hours, in denying his motion to strike two potential jurors for cause, in finding that he was a sexually violent person, and in committing him to institutional care, since the delays were either attributable to, or acquiesced in by, respondent, it would be unfair to allow respondent to complain about an error he induced or accepted, respondent failed to establish he was prejudiced by the denial of his motion to strike two potential jurors, respondent's arguments did not undermine the finding that he was sexually violent, and respondent's placement in a secure facility was not an abuse of discretion. |
| Decision Under Review | Appeal from the Circuit Court of Knox County, No. 10-MR-81; the Hon. Scott Shipplett, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Jamie L. Mitchell, of Statham Long & Mitchell, LLC, of Galesburg, for appellant. |
| | Lisa Madigan, Attorney General, of Chicago (David A. Simpson, Assistant Attorney General, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion. |
| | Justice Lytton concurred in the judgment and opinion. |
| | Presiding Justice Schmidt specially concurred, with opinion. |

**OPINION**

¶ 1    After a jury trial, respondent, Jeremy Trulock, was found to be a sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (Act or SVP Act) (725 ILCS 207/1 to 99 (West 2008)) and was committed for institutional care in a secure facility. Respondent appeals, arguing that the trial court erred in: (1) denying his motion to dismiss the commitment petition for the State's failure to hold a probable cause hearing within the time period required by the Act; (2) denying his motion to strike two potential jurors for cause; (3) upholding the jury's finding that he was a SVP; and (4) committing him to institutional care. We affirm the trial court's judgment.

¶ 2                                    FACTS

¶ 3    On June 3, 2010, while respondent was serving a prison sentence, the State filed a petition under the Act to have respondent committed to institutional care as a SVP. In the petition, the State requested that a probable cause hearing be held within 72 hours, as required by the Act. On the following day, June 4, the parties appeared in court on the petition, and the State announced that it was ready to proceed on a probable cause hearing.[1] Respondent's attorney, however, requested a continuance so that he could have additional time to prepare for the hearing. The trial court granted that request and continued the case until June 8.

¶ 4    On June 7, respondent's attorney filed a motion to substitute judge as a matter of right. The parties appeared in court on June 8 for the scheduled probable cause hearing and the

_____
[1]Unless otherwise noted, all of the dates listed in this section of the facts are from 2010.

matter was continued for reassignment based upon respondent's motion to substitute. On August 17, prior to reassignment, respondent's attorney filed a motion to dismiss the petition, alleging that respondent was denied due process because the State failed to hold a probable cause hearing within the time period required by the Act. Two days later, an order was entered by the trial court reassigning the case to another judge, as requested in respondent's motion to substitute.

¶ 5    On September 1, a hearing was held on the motion to dismiss before the newly assigned trial judge. After listening to the arguments of the attorneys, the trial court denied respondent's motion to dismiss the SVP petition. That same day, a probable cause hearing was held, and the trial court found that probable cause existed to believe that respondent was a SVP.

¶ 6    A jury trial was held on the SVP petition in May of 2011. The jury selection process involving three of the potential jurors, J.J., G.H., and L.S., is of relevance to this appeal. During initial questioning by the trial court, all three potential jurors indicated that: (1) they would not use sympathy, bias, or prejudice in making their decision; (2) they would wait until they heard all of the evidence, arguments, and instructions before making up their minds; (3) they would follow the law, even if they personally disagreed with it; (4) they understood that respondent was presumed not to be a SVP; (5) they understood that the State had the burden of proof beyond a reasonable doubt; (6) they understood that respondent did not have to present any evidence; (7) they understood that respondent did not have to testify and that respondent's failure to testify could not be held against him; and (8) there was no reason why they could not be fair and impartial.

¶ 7    One of the initial panels of prospective jurors included prospective juror J.J. When J.J. was question by respondent's attorney regarding the circumstances of respondent's prior sex offenses, the following discussion took place:

"[RESPONDENT'S ATTORNEY]: [I]s there anybody here that if they heard evidence that somebody had been convicted of sex with minor females on more than one occasion that they would feel like, well, that['s] all I–that would already make my mind up for me, I wouldn't have to hear anything else? If you feel that way, raise your hand.

PROSPECTIVE JUROR [J.J.]: I might have a little trouble. You said five year old.

[RESPONDENT'S ATTORNEY]: Okay. [J.J.]; is that right?

PROSPECTIVE JUROR [J.J.]: Yes.

[RESPONDENT'S ATTORNEY]: Just let me go into that a little bit further, [J.J.]

PROSPECTIVE JUROR [J.J.]: I wouldn't. I don't think I would if you were talking about teens but–

[RESPONDENT'S ATTORNEY]: Teens. Is there–is there a cutoff point there? If they were under ten or above ten or–and I appreciate your honesty.

PROSPECTIVE JUROR [J.J.]: I don't know. I just–when I heard the word 'five', that might bother me.

[RESPONDENT'S ATTORNEY]: Okay. Would it–and the Judge asked you earlier, he said is there anybody here that has any prejudices or biases or–and that may be a

-3-

prejudice where you're saying, okay, if I hear about sex and a five-year-old girl, I've already made my mind up. Is that the way you would feel? Is that what you're saying?

PROSPECTIVE JUROR [J.J.]: I think it possibly could be, yes."

¶ 8 After questioning some of the other potential jurors questions, respondent's attorney asked J.J. some additional questions:

"[RESPONDENT'S ATTORNEY]: Okay. And, [J.J.], I'm going to follow-up with that question. Was there a cutoff point there? I mean, you said–

PROSPECTIVE JUROR [J.J.]: I don't know. I just know when I hear things that have happened to little, little children–

[RESPONDENT'S ATTORNEY]: Uh-huh.

PROSPECTIVE JUROR [J.J.]: –I have a hard time with it.

[RESPONDENT'S ATTORNEY]: Okay. And is there any age that you feel like a–

PROSPECTIVE JUROR [J.J.]: I can't say that there is, but I don't feel that way about–when we talk about, I don't know, ten, maybe in the class it wouldn't bother me.

[RESPONDENT'S ATTORNEY]: Yeah.

PROSPECTIVE JUROR [J.J.]: I think I could handle it pretty much. I'm just not positive about if a little bitty one was involved."

¶ 9 When the panel of prospective jurors was submitted to the attorneys, respondent's attorney moved to strike J.J. for cause. The trial court denied that request, finding that J.J.'s answers suggested that J.J. "could hear the evidence and be fair and impartial." Respondent's attorney used one of his peremptory challenges to strike J.J. from the panel.

¶ 10 A later panel of prospective jurors included prospective juror G.H. When G.H. was questioned by respondent's attorney in relation to respondent's prior sex offenses, the following conversation ensued:

"[RESPONDENT'S ATTORNEY]: Do you have any problem with–you hear testimony that somebody's–[respondent's] been convicted [of] three prior incidents involving underage girls. Would that cause you to–

PROSPECTIVE JUROR [G.H.]: He's been convicted of three others?

[RESPONDENT'S ATTORNEY]: If you heard that in the testimony that he'd already been convicted.

PROSPECTIVE JUROR [G.H.]: Yeah, it would make me kind of lean towards this one too, yes.

[RESPONDENT'S ATTORNEY]: Okay. Now, you said 'lean towards'. But let me back up a minute. You said 'this one too'. You understand he's not charged with another crime; right?

PROSPECTIVE JUROR [G.H.]: Right.

[RESPONDENT'S ATTORNEY]: You understand that the testimony of the doctors will be something that you have to decide in regards to that. But my question to you then would be if you knew before we even get started that he's been convicted of three offenses involving young ladies under 16, does that put you in a situation where you're

saying I can't be fair?

PROSPECTIVE JUROR [G.H.]: If he's done it three times before, what's saying he wouldn't do it again?

[RESPONDENT'S ATTORNEY]: Okay. And you would feel that way without even hearing from the doctors before we get started?

PROSPECTIVE JUROR [G.H.]: I suppose if I was here, I'd listen to that, yes.

[RESPONDENT'S ATTORNEY]: Okay. What I'm hearing, what I'm hearing, [G.H.], is that you're saying you would listen to it but has that alone–

PROSPECTIVE JUROR [G.H.]: I would be as fair as I possibly could be, yes.

[RESPONDENT'S ATTORNEY]: Okay. But those convictions would have a pretty big impact?

PROSPECTIVE JUROR [G.H.]: (Indicating.)"

¶ 11    When the panel of prospective jurors was submitted to the attorneys for approval, respondent's attorney moved to strike G.H. for cause. The trial court denied that request. Respondent's attorney used one of his peremptory challenges to strike G.H. from the panel.

¶ 12    Another panel of prospective jurors included prospective juror L.S. During questioning, L.S. indicated that she had certain relatives and acquaintances in law enforcement but that those relationships would not cause her to be unfair. L.S. also indicated that she had a general knowledge of the SVP law because, as a health care worker, she was a mandatory reporter of child abuse. L.S. indicated, however, that none of that would cause her to be unfair. L.S. served on a jury the previous week and stated that her jury service taught her that her judgment could be persuaded to change over the course of deliberations. When the panel of prospective jurors was submitted to the attorneys for approval, respondent's attorney did not move to strike L.S. for cause. Respondent's attorney had used up all of his peremptory challenges by that point and did not ask for additional challenges or object in any way to L.S. As a result, L.S. was seated on respondent's jury.

¶ 13    During the evidence phase of the trial, the State presented the testimony and the written reports of two expert witnesses: Dr. John Arroyo and Dr. Raymond Wood. Dr. Arroyo, a licensed psychologist, testified that he worked for Wexford Health Services, which had a contract with the Department of Corrections (DOC), to provide evaluations. As part of his job, Arroyo evaluated incarcerated individuals, who were approaching their release date, to determine if they were SVPs under the SVP Act. Arroyo described his background and experience to the jury and was qualified by the trial court as an expert in clinical psychology. Arroyo had completed about 67 SVP evaluations in his career and had found about 27 people to be SVPs. Arroyo testified that he reviewed respondent's records, including his DOC master file, police reports, court records, probation and parole reports, criminal history, mental health records, and treatment records.

¶ 14    On the witness stand, Arroyo discussed respondent's criminal history at length. Arroyo noted that respondent was born in 1978 and had been convicted of three sex offenses during his lifetime: criminal sexual abuse in 1995, when he was 17; aggravated criminal sexual abuse in 2000, when he was 21; and a second aggravated criminal sexual abuse in 2005,

when he was 27. In the 1995 case, respondent was accused of forced sexual intercourse with a 16-year-old special-needs girl. In the 2000 case, respondent was accused of having sexual intercourse with a 13-year-old special-needs girl. Respondent admitted that he had done so, but stated that he thought the girl was older. There was no indication of force in that case. In the 2005 case, respondent was accused of fondling a five-year-old girl's vagina for sexual arousal. Respondent denied committing that offense. Respondent also had convictions in a 2007 case and in a 2009 case for failure to register as a sex offender and had other non-sex-related convictions and one other possible sex-related conviction.

¶ 15 In addition to respondent's criminal history, Arroyo also discussed respondent's treatment history regarding both substance-abuse treatment and sex-offender treatment. The reports indicated that respondent had a substance-abuse problem as to both alcohol and drugs. Respondent had previously attended substance-abuse treatment on more than one occasion but had never successfully completed treatment. With regard to sex-offender treatment, respondent had attempted treatment several times between 1995 and 2009 but had never successfully completed it. Respondent's treatment was terminated for such things as failure to comply and failure to attend, because of his substance-abuse problems or run-ins with police, or due to his own voluntary termination of treatment because his parole or probation had ended. According to Arroyo, respondent had attended treatment through approximately six different treatment providers over the past several years.

¶ 16 In May of 2010, as part of the evaluation process, Arroyo attempted to meet with respondent. After Arroyo explained the process to respondent, respondent declined to participate in an in-person interview with Arroyo based upon the advice of his attorney. Arroyo testified, however, that he was able to complete an evaluation without an in-person interview because he had detailed records regarding respondent.

¶ 17 Based upon his evaluation, Arroyo diagnosed respondent as having the following mental conditions: (1) paraphilia not otherwise specified (NOS), nonconsent; and (2) personality disorder NOS with antisocial and narcissistic features. Arroyo explained those diagnoses to the jury and also explained the factors that led him to reach those diagnoses. Arroyo testified that paraphilia NOS, sexually attracted to nonconsenting persons, was a congenital or acquired condition affecting the emotional or volitional capacity that predisposed a person to engage in acts of sexual violence. Arroyo stated further that the personality disorder, on its own, would not predispose a person to engage in acts of sexual violence, but that the two disorders combined (paraphilia and personality disorder) would make a person's condition worse than each disorder individually.

¶ 18 Arroyo used two actuarial tests (actuarials) to assist him in determining whether respondent was likely to reoffend, the Static-99R and the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R). Arroyo explained those actuarials to the jury, told the jury how they were used, and informed the jury as to why he used those particular actuarials, rather than other actuarials that were available. On each of the actuarials, respondent scored in a range that placed him at a high risk to reoffend. In addition to the actuarials, Arroyo also considered dynamic risk factors (factors which can change over time) and protective risk factors. Arroyo explained that those factors were not taken into account in the actuarials and could tend either to increase or decrease a person's risk level. Arroyo explained those factors

to the jury and told the jury how he weighed those factors in respondent's case. Based on his evaluation of respondent, Arroyo opined that respondent was substantially probable to engage in future acts of sexual violence.[2] Arroyo opined further that respondent met the criteria for being a SVP as defined in the SVP Act. Arroyo's findings were memorialized in a written report, which was admitted into evidence as an exhibit at trial.

¶ 19    Dr. Raymond Wood testified as the second expert for the State. Wood stated that he was a clinical psychologist who, under a contract with the Department of Human Services, evaluated persons for SVP commitment. Wood testified about his background and experience and was qualified by the trial court as an expert in psychology. Wood had completed approximately 370 SVP evaluations in his career. Wood conducted his evaluation in this case after the SVP petition was filed. In conducting his evaluation, Wood reviewed respondent's records (DOC master file, police records, court records, treatment records, etc.) and conducted a clinical interview of respondent.

¶ 20    The interview took place in September and October 2010. Wood discussed with respondent the prior offenses, the prior treatment, and other pertinent matters. Respondent answered all of Wood's questions, but his answers were vague at times and seemed to be guarded. Wood also conducted certain psychological tests on respondent.

¶ 21    Wood diagnosed respondent as having the following mental conditions: paraphilia NOS, with mixed features; alcohol and cocaine dependence, in a controlled environment; cannabis dependence; and antisocial personality disorder. Wood explained to the jury what factors led him to reach those diagnoses. Wood stated that all of the conditions, except possibly cannabis dependence, were congenital or acquired conditions affecting the emotional or volitional capacity that would predispose a person to engage in acts of sexual violence.

¶ 22    Wood used two actuarials, the Static-99 and the MnSOST-R, to evaluate respondent's risk of reoffending. Based on the actuarials and the other information he considered, Wood stated that respondent was a high risk to reoffend on the Static-99 (the highest category) and also in the highest category to reoffend on the MnSOST-R, listed as "refer," meaning that there was a presumption that the person would be referred for commitment. Wood explained to the jury why he used those particular actuarials as compared to others that were available. In making his assessment, Wood used the actuarials to establish a baseline and then considered other factors that were not part of the actuarials that were known to be associated with reoffending. Based on his evaluation, Wood opined that there was a substantial probability that respondent would engage in future acts of sexual violence. Wood opined further that respondent was a SVP as defined in the SVP Act. Wood prepared a written examination report, which was admitted into evidence as an exhibit at the trial.

¶ 23    Defendant did not testify on his own behalf but did present the written report and testimony of one expert witness: Dr. Kirk Witherspoon. Witherspoon testified that he was a clinical psychologist in private practice and was licensed in both Illinois and Iowa. Witherspoon described his background and experience for the jury and stated that over the

---

[2]All of the opinions given by the experts in this case were given to a reasonable degree of psychological certainty.

-7-

last 13 years, he had completed hundreds of SVP evaluations all over the state. Witherspoon was qualified by the trial court as an expert witness in clinical psychology.

¶ 24      Before he met with respondent, Witherspoon looked at the discovery in the case, which included respondent's criminal history, mental health records, and medical information. After reviewing the records to get a general picture, Witherspoon interviewed respondent to determine his current mental status and performed extensive testing. According to Witherspoon, respondent's reading comprehension was at about a fifth-grade level or a little better. Witherspoon found that respondent had attention deficit problems and mild learning problems. Witherspoon told the jury that attentional problems were important because they had symptoms or behaviors that could overlap with antisocial kinds of behaviors, such as trouble keeping a job or staying on task. Witherspoon commented that certain antisocial behaviors were also the primary symptoms of adult attention deficit hyperactivity disorder (ADHD), which was typically treatable with medication.

¶ 25      Witherspoon recounted respondent's history of sexual offenses and sexually related offenses. Witherspoon noted that in the three sex offenses, all three victims claimed that respondent used force, but respondent claimed that he did not use force. In the most recent offense, with the five-year-old girl, respondent denied that the offense happened, and the girl's mother suggested that the incident could not have happened.

¶ 26      Witherspoon saw signs that respondent was suffering from anxiety and depression. Witherspoon gave respondent the Millon Clinical Multiaxial Inventory-III test (MCMI-III) to aid him in determining a mental diagnosis and to help him rule out competing problems. The test showed that respondent had moderate antisocial tendencies and also substance abuse difficulties. Another test that Witherspoon gave respondent indicated that the antisocial tendencies were secondary to the substance abuse problems. In Witherspoon's opinion, respondent's chronic alcohol and substance abuse was the cause of most of respondent's other problems.

¶ 27      One of the main tests that Witherspoon gave respondent for sexual psychopathology was the Multidimensional Inventory of Development, Sex, and Aggression test (MIDSA). Based on the results of the MIDSA test, Witherspoon found that respondent did not have sexual psychopathology, deviant sexual tendencies, or deviant sexual interests, at this point.

¶ 28      Witherspoon diagnosed respondent as having the following mental disorders: polysubstance dependence, ADHD, a reading disorder, and a moderate antisocial personality disorder (APD). In Witherspoon's opinion, none of those diagnoses would constitute a congenital or acquired condition that would predispose a person to reoffend.

¶ 29      Witherspoon testified that a SVP evaluation was too complicated to do without meeting personally with the subject and stated that to fail to do so was not ethically recommended. According to Witherspoon, APD, by itself, was not a mental health disorder that would predispose a person to commit future sex offenses. Rather, APD was an intensifier for certain kinds of sexual offending, if a person had a sexual disorder.

¶ 30      To determine respondent's risk level, Witherspoon used the following tests or actuarials: the Static-2002R, the Sexual Violence Risk-20 (SVR-20), and the Structured Risk Assessment (SRA). Witherspoon explained to the jury why he used those particular tests as

compared to other tests or actuarials that were available. Based upon the tests he performed and his evaluation, Witherspoon opined that respondent's risk to reoffend was moderate or slightly below moderate and explained to the jury how he reached that conclusion. Witherspoon opined further that respondent's risk of reoffending, in an absolute sense, was quite low percentage-wise. Witherspoon did not diagnose respondent as having paraphilia and stated that respondent did not meet the diagnostic criteria for that mental disorder. Witherspoon did not opine as to whether respondent was a SVP as defined in the SVP Act and stated that such an opinion was a legal conclusion, which was not a proper opinion to be drawn by someone in his profession.

¶ 31    At the conclusion of the trial, the jury rendered a verdict, finding that respondent was a SVP. Respondent filed a motion for new trial, raising numerous issues. One of the issues raised in the motion was that the trial court erred in denying respondent's request to strike prospective jurors J.J. and G.H. for cause. After a hearing, the trial court denied the motion for new trial. In so doing, as to the jury selection issue, the trial court stated:

> "Regarding the preempts, I think all the jurors who came in after hearing what the case was about, they all had a gut feeling as to how they felt about it, and I would–I would say it was probably running 95 percent against [respondent], you know. I think there was only one guy who came in and he thought the whole law was un-American and it should be thrown out on its ear, but–but notwithstanding that gut reaction after hearing what the case was about, every juror was given an opportunity to be rehabilitated; to ask whether or not–notwithstanding their emotional first reaction–if they intellectually could set that aside; review the evidence; give the [r]espondent the benefit of the presumption that he was not a sexually violent person and to require the State to meet its burden. And they all, I believe, were successfully rehabilitated. And if they weren't, I bumped them. If they did, I left it to you to decide that, notwithstanding that, if your gut reaction to them was sufficient to give a peremptory challenge. And I don't think there was anything manifestly unfair or abusive in those rulings.

> I don't think there is such a thing as a perfect trial, but there are fair trials and unfair trials. I think this was a fair trial, and I'm going to deny the motion for a new trial."

¶ 32    In July 2011, a dispositional hearing was held in this case. The State presented a supplemental report from Dr. Wood regarding treatment options for respondent. The trial court also considered Dr. Witherspoon's earlier written report and all of the evidence presented at the trial. Respondent testified on his own behalf. At the conclusion of the hearing, the trial court found that the appropriate placement for respondent was institutional care in a secure facility. In reaching that conclusion, the trial court stated:

> "I have to respect the jury's verdict on that and consider that that is the fact, that you are a sexually violent person and you are likely to engage in future acts of sexual violence. It's what the jury found.

> With that now being the–the framework of where I'm at, I will tell you that I–I want to let you out. I want to give you the most minimally invasive, least restrictive disposition that I can consistent with the jury verdict. I want you to have the least restrictive alternative. I want you to be on conditional release. But what I want, like a jury

-9-

might–their gut reaction has to be subject to intellectual review. And I have to consider the facts in the–Dr. Wood's report that in you prior attempts at what I would call conditional release or conditional discharge with outpatient treatment, it was marked by an ambivalent attitude, poor attendance, superficial cooperation. The treatment was never truly internalized. Nominal participation and poor compliance with court orders. That does not sound very well. And your prior performance on conditional discharge, probation, and the treatment is dismal, I mean, really. Part of that was your fault and maybe part of it wasn't.

[The attorney for the State] talked about no completion of treatment, and Dr. Witherspoon in his report noted that that kind of cuts both ways. He thought that–he said there are some treatment providers who believe you never complete treatment. It's like being an alcoholic. You know, you're never over it. You're just in a permanent state of rehabilitation, and you'll never be–you'll never be cured. And so how you've completed or if you complete treatment or not isn't maybe the best marker in my estimation; but certainly, there's a continuum of not having had any treatment and starting to internalize the treatment and being not just superficially cooperative, but being fully cooperative that I think are markers that we need to see so that we know you're making adequate process [*sic*] towards the conditional release.

I think that–you know, and I do want to review the case and I think we're required to review the case every year.

\* \* \*

So in–in six months we're going to review the case; but until I have those markers and some assurances from your–your treatment provider, I believe that the appropriate disposition at this point would be placement with the Department of Health and Human Services at the treatment and detention facility pending progress towards a conditional release into the community."

¶ 33   Respondent appealed, raising numerous issues.

¶ 34                                    ANALYSIS

¶ 35   As his first point of contention on appeal, respondent argues that the trial court erred in denying his motion to dismiss the SVP petition for the State's failure to hold a probable cause hearing within the time period required by section 30(b) of the Act. Respondent acknowledges that the Act does not specify a remedy for such a failure but argues that the time requirement is similar to the time requirement for a preliminary hearing under the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/109-3.1(b) (West 2008)), and that the appropriate remedy for a violation of the time requirement under the Act is a dismissal, just as it is for a violation of the time requirement under the Code (see 725 ILCS 5/114-1(a)(11) (West 2008)). The State asserts that the motion to dismiss was properly denied because: (1) nothing in the Act or the Illinois Constitution requires a dismissal under these circumstances; (2) reading an automatic dismissal into the Act would require the release of SVPs for reasons that the legislature could not have intended; and (3) respondent cannot complain that he did not receive a prompt probable cause hearing because all of the delay was attributable to him.

Thus, the State argues that we should affirm the trial court's ruling.

¶ 36   Our decision on this issue involves a mixed standard of review. The determination of whether to grant or deny a respondent's motion to dismiss a SVP petition for failure to hold a probable cause hearing within the time period required under the Act is a determination that rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. See *People v. Clarke*, 231 Ill. App. 3d 504, 508 (1992) (appellate court applied an abuse-of-discretion standard of review to trial court's decision on motion to dismiss charge in criminal case for failure to hold a preliminary hearing within the time period required under the Code). However, to the extent that we are called upon to interpret the Act in ruling upon this issue, that question is one of law, which is subject to a *de novo* standard of review on appeal. See *People v. Donoho*, 204 Ill. 2d 159, 172 (2003).

¶ 37   In construing the provisions of the Act, we will apply the well-settled rules of statutory construction. The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Dabbs*, 239 Ill. 2d 277, 287 (2010). The most reliable indicator of that intent is the plain and ordinary meaning of the language of the statute itself. *Dabbs*, 239 Ill. 2d at 287. In determining the plain meaning of statutory terms, a court should consider the statute in its entirety and keep in mind the subject the statute addresses and the apparent intent of the legislature in enacting the statute. *Dabbs*, 239 Ill. 2d at 287; *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002) (in determining legislative intent, a court may consider not only the language of the statute itself, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved); 5 ILCS 70/1.01 (West 2008) (in construing a statute, "[a]ll general provisions, terms, phrases and expressions shall be liberally construed in order that the true intent and meaning of the General Assembly may be fully carried out"). If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *Dabbs*, 239 Ill. 2d at 287. A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 117 (2007). In addition, "[b]ecause all provisions of a statutory enactment are viewed as a whole [citations], words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute [citations]." *Lieberman*, 201 Ill. 2d at 308. If possible, each word, clause, and sentence must be given reasonable meaning and not rendered superfluous. *Lieberman*, 201 Ill. 2d at 308. It is presumed that the legislature did not intend absurdity, inconvenience, or injustice. *Lieberman*, 201 Ill. 2d at 309.

¶ 38   Section 30(b) of the SVP Act provides:

"Whenever a petition is filed under Section 15 of this Act, the court shall hold a hearing to determine whether there is probable cause to believe that the person named in the petition is a sexually violent person. If the person named in the petition is in custody, the court shall hold the probable cause hearing within 72 hours after the petition is filed, excluding Saturdays, Sundays and legal holidays. The court may grant a continuance of the probable cause hearing for no more than 7 additional days upon the motion of the respondent, for good cause. If the person named in the petition has been released, is on

-11-

parole, is on mandatory supervised release, or otherwise is not in custody, the court shall hold the probable cause hearing within a reasonable time after the filing of the petition. At the probable cause hearing, the court shall admit and consider all relevant hearsay evidence." 725 ILCS 207/30(b) (West 2008).

The Act does not specify a remedy for a failure to hold a probable cause hearing within the time period required by section 30(b). The question before this court, therefore, is whether a violation of the time requirement in section 30(b) for a probable cause hearing on a SVP petition requires a dismissal of the SVP petition.

¶ 39    Although there is no Illinois case directly on point on this issue, we find the Wisconsin case of *In re Commitment of Beyer*, 2001 WI App 167, 633 N.W.2d 627, to be persuasive. Illinois courts have previously noted that the Wisconsin SVP Act is very similar to the Illinois SVP Act and have looked to decisions of the Wisconsin courts for guidance in construing the Illinois SVP Act. See, *e.g.*, *In re Detention of Hardin*, 238 Ill. 2d 33, 46 (2010); *People v. Masterson*, 207 Ill. 2d 305, 324-25 (2003); *In re Detention of Hayes*, 321 Ill. App. 3d 178, 188 (2001). In *Beyer*, the Wisconsin Court of Appeals found that the timing requirement for probable cause hearings under the Wisconsin SVP Act was directory, rather than mandatory, and that the failure to comply with that requirement did not require a dismissal of the SVP petition. *Beyer*, 2001 WI App 167, ¶¶ 8-15, 633 N.W.2d 627. In reaching that conclusion, the *Beyer* court noted that to rule otherwise would undermine the Act's objectives to treat convicted sex offenders who were at high risk to reoffend and to protect the public from such offenders. *Beyer*, 2001 WI App 167, ¶ 10, 633 N.W.2d 627. The *Beyer* court also pointed out that requiring dismissal in such a case could allow a person subject to a SVP petition to use the time requirement as a loophole to avoid commitment by making a last-minute motion for judicial substitution. See *Beyer*, 2001 WI App 167, ¶¶ 12-13, 633 N.W.2d 627. The *Beyer* court noted further that it was the individual's due process right to have a hearing within a reasonable time that protected a respondent from having the time limit extended indefinitely. *Beyer*, 2001 WI App 167, ¶ 14, 633 N.W.2d 627.

¶ 40    As a matter of statutory construction, we reach the same conclusion here as the Wisconsin court reached in *Beyer*. See *Beyer*, 2001 WI App 167, ¶¶ 8-15, 633 N.W.2d 627. To require dismissal in the present case would be to read a condition into the Act that the legislature did not expressly set forth and would allow for the release of possible SVPs in a manner that could not reasonably have been intended by the legislature. See *Beyer*, 2001 WI App 167, ¶¶ 8-11, 633 N.W.2d 627. We conclude, therefore, that the failure to hold a probable cause hearing within the time period set forth in section 30(b) does not require the automatic dismissal of a SVP petition. See *Beyer*, 2001 WI App 17, ¶¶ 8-15, 633 N.W.2d 627. We also conclude that the time period involved in the present case was not unreasonable under the circumstances in terms of due process. See *Beyer*, 2001 WI App 167, ¶ 15, 633 N.W.2d 627. Thus, we find that the trial court did not commit an abuse of discretion in denying respondent's motion to dismiss the SVP petition in the present case. See *Beyer*, 2001 WI App 167, ¶ 15, 633 N.W.2d 627.

¶ 41    In reaching that conclusion, we note that all of the delays in the present case were either attributable to, or acquiesced in by, respondent. That reason alone would support upholding the trial court's denial of the motion to dismiss. See *In re Detention of Swope*, 213 Ill. 2d

210, 217 (2004). It would be unfair to allow a party to complain on appeal about an error which that party induced the trial court to make or to which that party consented. *Swope*, 213 Ill. 2d at 217.

¶ 42 As his second point of contention on appeal, respondent argues that the trial court erred in denying his motion to strike prospective jurors J.J. and G.H. for cause. Respondent asserts that he was prejudiced by the denial in that he had to use two of his peremptory challenges to strike J.J. and G.H. and had no peremptory challenges left to strike a third objectionable juror, L.S., who ended up serving on the jury. Based on the alleged error, respondent asks that we reverse the trial court's judgment and remand this case for a new trial. The State asserts that respondent's jury-composition claim is meritless because: (1) it was forfeited when respondent failed to object in the trial court to L.S. being seated on the jury; (2) it was not against the manifest weight of the evidence for the trial court to conclude that J.J. and G.H. could be fair and impartial; and (3) even if the trial court's ruling was erroneous, respondent cannot show that the error was prejudicial to him, since there is no indication that L.S. was biased against respondent.

¶ 43 A trial court's determination of whether a person is competent to sit as a juror will not be reversed on appeal unless it is against the manifest weight of the evidence. *People v. Cole*, 54 Ill. 2d 401, 414 (1973). A finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is unreasonable, arbitrary, or not based upon the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Under the manifest-weight standard, deference is given to the trial court as finder of fact because the trial court is in a better position than the reviewing court to observe the conduct and demeanor of the parties and witnesses, or in this case, the potential jurors. See *Best*, 223 Ill. 2d at 350. "A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Best*, 223 Ill. 2d at 350-51.

¶ 44 One of the purposes of *voir dire* is to filter out those potential jurors who are either unable or unwilling to be fair and impartial. See *People v. Pendleton*, 279 Ill. App. 3d 669, 674 (1996). A person is incompetent to sit as a juror if his state of mind is such that a party will not receive a fair and impartial trial with that person as a member of the jury. *Cole*, 54 Ill. 2d at 413. The determination of juror competency is not a purely objective determination, and the trial court may consider a statement of a potential juror as evidence of that person's state of mind. *Cole*, 54 Ill. 2d at 414. In making such a determination, the trial court should consider the potential juror's entire *voir dire* examination and should not single out any certain statement. See *People v. Peeples*, 155 Ill. 2d 422, 462-63 (1993). The burden of showing that a person is not competent to sit as a juror falls on the party challenging the juror. *Cole*, 54 Ill. 2d at 413. Mere suspicion of bias or partiality is not sufficient to disqualify a potential juror. *Cole*, 54 Ill. 2d at 415.

¶ 45 Under federal constitutional law, "as long as a defendant receives a fair and impartial trial, Federal due process is not denied where a defendant exhausts all of his peremptory challenges and used one of them to remove a juror who should have been removed for cause." *Pendleton*, 279 Ill. App. 3d at 675 (citing *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988)).

-13-

In addition, the well-settled rule in Illinois is that a court's failure to remove a juror for cause is grounds for reversal only if prejudice can be shown; that is, only if the party challenging the juror has exercised all of his peremptory challenges and an objectionable juror was allowed to sit on the jury. See *Spies v. Illinois*, 122 Ill. 1, 258 (1887); *Pendleton*, 279 Ill. App. 3d at 675. Although the Illinois Constitution guarantees the right to an impartial jury, it does not guarantee the right to choose a jury that is sympathetic to a specific party or to a specific legal theory. See *Pendleton*, 279 Ill. App. 3d at 677.

¶ 46    In the present case, even if we were to assume that the trial court's denial of respondent's motion to remove J.J. and G.H. for cause was erroneous, we would still have to find that the trial court's ruling in that regard did not constitute reversible error because respondent failed to establish that he suffered any prejudice from the trial court's ruling. See *Spies*, 122 Ill. at 258; *Pendleton*, 279 Ill. App. 3d at 677. Although respondent had to use up his peremptory challenges to remove J.J. and G.H. and makes the vague assertion on appeal that doing so allowed a third objectionable juror, L.S., to be seated on the jury, the record contains no evidence that L.S. was an improper juror or that L.S. should have been excused. Rather, the record before us indicates overwhelmingly that L.S. had the ability to be a fair and impartial juror. Because respondent cannot show prejudice, his argument on this issue must be rejected. See *Spies*, 122 Ill. at 258; *Pendleton*, 279 Ill. App. 3d at 677. We need not address the other assertions that were made by the State on this issue in support of the trial court's ruling.

¶ 47    As his third point of contention on appeal, respondent argues that the trial court erred in denying his motion for new trial based upon the sufficiency of the evidence. Respondent asserts first that the State failed to prove beyond a reasonable doubt that he suffered from a requisite mental disorder. In making that assertion, respondent points out that his own expert witness vehemently disagreed with the opinions given on the mental-disorder element by the State's expert witnesses. Respondent asserts second that the State also failed to prove beyond a reasonable doubt that it was substantially probable that he would engage in future acts of sexual violence. In making that assertion, respondent contends that the opinions of the State's expert witnesses were flawed on that element in that they were based upon outdated actuarial tests regarding respondent's risk of reoffending. The State disagrees with respondents various assertions and contentions and argues that the evidence was sufficient to support the jury's finding that respondent was a SVP.

¶ 48    When faced with a challenge to the sufficiency of the evidence in a SVP proceeding, the reviewing court must view the evidence in a light most favorable to the State and determine whether any rational trier of fact could have found the required elements proven beyond a reasonable doubt. *In re Detention of Welsh*, 393 Ill. App. 3d 431, 454 (2009); see also *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (sets forth the standard of review for a sufficiency-of-the-evidence claim in a criminal case). The reviewing court will not retry a SVP case on appeal. *In re Tittlebach*, 324 Ill. App. 3d 6, 11 (2001). Rather, it is the responsibility of the trier of fact to evaluate the credibility of the witnesses, to weigh and resolve conflicts in the evidence, and to determine the reasonable inferences to be drawn from the evidence. *Tittlebach*, 324 Ill. App. 3d at 11. A reviewing court will not reverse a determination that a person is a SVP unless the evidence is so improbable or unsatisfactory that it leaves a

reasonable doubt as to that matter. See *People v. Jackson*, 232 Ill. 2d 246, 281 (2009) (sets forth the standard that applies to a sufficiency-of-the-evidence claim in a criminal case).

¶ 49 To establish that a person is a SVP, the State must prove the following three elements beyond a reasonable doubt: (1) that the person has been convicted of a sexually violent offense; (2) that the person has a requisite mental disorder; and (3) that the person is dangerous to others because the mental disorder creates a substantial probability that the person will engage in future acts of sexual violence. See 725 ILCS 207/5(f), 15(b), 35(d)(1) (West 2008); *Welsh*, 393 Ill. App. 3d at 454. Respondent here challenges only the second and third elements: the mental-disorder element and the substantial-probability element. Under the Act, a mental disorder is defined as a "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2008). In addition, substantial probability has been defined by the courts as meaning "much more likely than not." See, *e.g.*, *Hayes*, 321 Ill. App. 3d at 188.

¶ 50 Having reviewed the record in the instant case, we find that the evidence, considered in the light most favorable to the State, was sufficient to prove beyond a reasonable doubt both the mental-disorder element and the substantial-probability element. See *Welsh*, 393 Ill. App. 3d at 454; *Collins*, 106 Ill. 2d at 281. The State's two expert witnesses testified that they reviewed extensive records regarding respondent; conducted evaluations and assessments on respondent, either in person or based upon the extensive records; and opined based upon all of that information that respondent had a requisite mental disorder and that the mental disorder created a substantial probability that respondent would engage in future acts of sexual violence. Although those opinions were contradicted by the opinion of respondent's expert witness, it was for the jury to weigh the credibility of the evidence and to resolve any conflicts therein. See *Tittlebach*, 324 Ill. App. 3d at 11. We will not retry respondent on appeal or substitute our judgment for that of the jury on this matter. See *Tittlebach*, 324 Ill. App. 3d at 11. The evidence presented was not so improbable or unsatisfactory as to leave a reasonable doubt that respondent was a SVP. See *Jackson*, 232 Ill. 2d at 281. Respondent's assertions and contentions to the contrary raise only matters that go to the weight to be given to particular expert testimony and do not undermine the sufficiency of the evidence. See *Welsh*, 393 Ill. App. 3d at 455; *Tittlebach*, 324 Ill. App. 3d at 11.

¶ 51 As his final contention on appeal, respondent argues that the trial court erred in committing him to institutional care in a secure facility, rather than placing him on conditional release. Respondent asserts that in reaching its decision, the trial court failed to consider some of the relevant statutory factors and focused instead upon certain improper evidence. Respondent asks that we reverse the trial court's commitment order. The State disagrees with respondent's assertions and argues that the trial court's commitment order was proper and should be affirmed.

¶ 52 Pursuant to section 40 of the Act, when a person is found to be a SVP, he shall be committed to the Department of Human Services. See 725 ILCS 207/40(a) (West 2008). The commitment order shall specify either institutional care in a secure facility or conditional release. 725 ILCS 207/40(b)(2) (West 2008). In determining the appropriate placement for a SVP, the court may consider such factors as: (1) the nature and circumstances of the

person's behavior; (2) the person's mental history and present mental condition; (3) where the person will live and work; and (4) what arrangements are available to ensure that the person has access to and will participate in necessary treatment. 725 ILCS 207/40(b)(2) (West 2008); *In re Detention of Erbe*, 344 Ill. App. 3d 350, 374 (2003). A trial court's decision to commit a SVP to institutional care in a secure facility is reviewed on appeal for an abuse of discretion. *Erbe*, 344 Ill. App. 3d at 374. An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Erbe*, 344 Ill. App. 3d at 374.

¶ 53     In the present case, evidence regarding the appropriate statutory factors was before the trial court when it made its decision to commit respondent to institutional care in a secure facility. The trial court's comments at the commitment hearing indicate that the trial court considered that evidence and weighed the factors accordingly. Contrary to respondent's assertion on appeal, we do not believe that it was improper for the trial court to consider respondent's prior participation in treatment and respondent's prior compliance with orders and terms of probation. In determining the appropriate placement for respondent, the trial court's ruling was not arbitrary, fanciful, or unreasonable and did not constitute an abuse of discretion.

¶ 54     For the foregoing reasons, we affirm the judgment of the circuit court of Knox County.

¶ 55     Affirmed.

¶ 56     PRESIDING JUSTICE SCHMIDT, specially concurring:

¶ 57     I concur in the judgment and also concur in the majority's opinion with the exception of the second issue raised by respondent and relating to his motion to strike two potential jurors for cause. *Supra* ¶¶ 42-46.

¶ 58     I would find the issue forfeited. Respondent had used all of his peremptory challenges. At no time did respondent ask for other peremptories or indicate that he would have excused juror L.S. The rationale applied by at least two appellate courts makes sense to me and I believe it should be applicable here. "In the present case, the defense exhausted its peremptory challenges, but it did not indicate to the trial court that it was being forced to accept an objectionable juror because of the error in overruling the prior challenge for cause. Notifying the trial court of this fact would have served the salutary purpose of giving the court a final opportunity to cure the alleged error by exercising its inherent power to grant the defense an extra peremptory challenge. Because the defense in the present case did not indicate that it was being forced to accept an objectionable juror as a result of the trial court's error, we hold that the error in denying the challenge for cause was waived." (Internal quotation marks omitted.) *People v. Green*, 199 Ill. App. 3d 927, 930-31 (1990) (quoting *People v. Washington*, 104 Ill. App. 3d 386, 392 (1982)).

¶ 59     "Illinois law is clear that both an objection and a written posttrial motion raising an issue are necessary to preserve any error for appellate review." *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 855 (2010). Respondent made no objection to L.S. during *voir dire*. He admitted, during posttrial arguments, that there "was no issue with cause with L.S." He did

not request additional peremptories; neither did he voice concern with the trial court after using his final peremptory that the process would somehow deny him a fair trial. If respondent has preserved this error for review, then anytime a party at trial has a challenge for cause denied, all he or she need do is make sure to exhaust all available peremptory challenges and then later go to the appellate court, arguing that one juror or another would not have been seated but for the trial court's error in denying the challenge for cause. This strikes me as being contrary to both the letter and spirit of the rules for preserving alleged errors for appellate review by first alerting the trial court of the alleged error and giving the trial court an opportunity to cure any alleged error.

¶ 60     I would find the issue forfeited and, therefore, do not join the majority's analysis with respect to this issue.