2022 IL App (1st) 181274-U

No. 1-18-1274

Order filed August 5, 2022

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* COMMITMENT OF RANDOLPH WILLIAMS | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 10 CR 80018 |
| | ) | |
| Randolph Williams, | ) | Honorable |
| | ) | Steven G. Watkins, |
| Respondent-Appellant). | ) | Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*: The State presented sufficient evidence to establish that respondent met the statutory criteria to be deemed a sexually violent person.

¶ 2    Following a 2017 jury trial, respondent Randolph Williams was found to be a sexually violent person (SVP) pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2016)) and was committed to the Department of Human Services (DHS). On

appeal, respondent contends that the State failed to prove him guilty beyond a reasonable doubt of being an SVP under the Act. We affirm.

¶ 3     Respondent was first convicted of a sexually violent offense in 1982, when he was 17 years old and on probation. In that case, he forced the victim to perform oral sex on him at gunpoint. Respondent and a co-offender then took the victim's car keys, his shoes, and a bicycle from the trunk of the victim's vehicle. Respondent pleaded guilty to armed robbery, armed violence, deviate sexual assault, and aggravated kidnapping, in exchange for a total sentence of six years in prison.

¶ 4     In 1986, approximately eight or nine months after respondent's release from custody and while he was on parole, respondent committed a second sexually violent offense. In that case, respondent, then age 21, cornered the victim in a residential elevator, brandished a knife, and threatened to kill her. He forced the victim into her apartment, where he took her money and ordered her to remove her clothes. He then forced her to perform oral sex on him, vaginally raped her, and ransacked the apartment. He pleaded guilty to aggravated criminal sexual assault, aggravated kidnapping, and armed robbery in exchange for a total sentence of 50 years in prison.

¶ 5     Respondent remained in prison until 2010. At that time, he was transferred to DHS custody at a Treatment and Detention Facility (TDF) based upon the State's petition that he be committed under the Act. On August 21, 2017, the State filed an amended petition to commit respondent to DHS as an SVP, alleging that he suffered from "other specified paraphilic disorder, sexually aroused by non-consenting persons, in a controlled environment."

¶ 6     At trial, the State introduced certified copies of respondent's convictions for deviate sexual assault and aggravated criminal sexual assault. The State also presented the testimony of two clinical psychologists, Drs. Raymond Wood and John Arroyo, who had evaluated respondent

through interviews and reviewed records pertaining to his criminal cases and detention. Both psychologists were accepted without objection as experts in the area of evaluation and risk assessment of sex offenders.

¶ 7 Dr. Wood testified that in 2011, he reviewed respondent's records, conducted psychological testing, and interviewed him over two days. Dr. Wood then prepared a report, which he updated in 2014 due to changes in the diagnostic manuals. Before trial, Dr. Wood reviewed respondent's criminal history and TDF records, including the master treatment plan, master treatment plan reviews, therapy notes, and medical records. He also reviewed the facts of respondent's past criminal offenses.

¶ 8 Dr. Wood opined that respondent suffered from three qualifying mental disorders under the Act at the time of the 2014 evaluation: (1) other specified paraphilic disorder, nonconsent, in a controlled environment (OSPD nonconsent); (2) antisocial personality disorder; and (3) alcohol, cannabis, cocaine, and phencyclidine (PCP) use disorders in a controlled environment. The qualifier "in a controlled environment" indicated that the diagnoses were made while respondent was in prison, as opposed to the community.

¶ 9 Dr. Wood explained that for a person to be diagnosed with the paraphilic disorder of OSPD nonconsent, "there has to be evidence or information for at least six months if the person has engaged or had sexually arousing fantasies, sexually arousing urges, behaviors, or thoughts to the extent that person has acted on those and so doing has created [a] possibility of harm to the individual or harm to *** others." Dr. Wood knew of the instances in 1982 and 1986 where respondent forced someone to engage in nonconsensual sex with him. Regarding the 1986 assault, respondent had reported in a TDF evaluation that he sexually assaulted the victim after thinking

about violent pornography he had seen. As such, Dr. Wood concluded there was reason to believe respondent had fantasies or thoughts about assaulting the victim prior to doing so.

¶ 10 Further, while at the TDF, respondent reported in a "homework" assignment that during incarceration, he had over 1100 fantasies about rape, forced oral sex, and restraint. He reported using "visual or oral descriptions of violent sex" or sexual violence about 200 times and masturbating daily to "inappropriate fantasies." He also admitted to masturbating while watching female correctional officers conduct rounds and cell checks. Dr. Wood characterized this behavior as objectification of the officers, explaining that for respondent, "this is not a person, this is just an object that I'm using for my own purposes." Respondent admitted to continuing to objectify women at the TDF.

¶ 11 Dr. Wood opined that respondent continued to suffer from OSPD nonconsent, as he could not be considered to be in remission until he spent five years in the community without experiencing inappropriate fantasies or engaging in such behavior. Moreover, nothing in the literature suggested that OSPD nonconsent disorders "just spontaneously go away."

¶ 12 Dr. Wood testified that respondent met the criteria for a diagnosis of antisocial personality disorder because he demonstrated a pervasive disregard for the rights or welfare of other people with evidence of a conduct disorder with onset before age 15. Respondent had reported stealing from stores and stealing bike parts by age 13, getting in fights and joining a gang by age 15, and being arrested three times by age 17. In combination with the diagnosis of OSPD nonconsent, respondent's antisocial personality disorder "would lead [him] in that direction" of forcing people to engage in nonconsensual sex with him. Dr. Wood opined that respondent continued to suffer from antisocial personality disorder, as evidenced by his being referred to the behavior committee

at the TDF three or four times, a consequence that only occurs when behavior reaches a certain level of severity.

¶ 13    Finally, respondent met the criteria for alcohol, cannabis, cocaine, and PCP use disorders in a controlled environment because the frequency of his use of the substances resulted in difficulties in social functioning. Respondent admitted to daily use of alcohol and cannabis and some use of cocaine and PCP. He reported having "a problem with PCP" and had smoked a "joint that had been laced with PCP" before committing the 1986 assault. The substance abuse disorders interacted with the other disorders to impair his judgment and reduce his inhibitions, thereby increasing his predisposition to commit acts of sexual violence against people whose rights he did not respect. Dr. Wood explained that he did not consider respondent to be in remission with regard to his substance abuse diagnoses, as he was unable to observe respondent in the community.

¶ 14    Dr. Wood testified that he conducted a risk assessment on respondent using two actuarial instruments commonly utilized to evaluate dangerousness: the Static 99R and the Static 2002R. Respondent's score of eight on the Static 99R fell in the "well above average" risk category, the highest on the instrument, and indicated he was more than seven times more likely to reoffend than the average sex offender. His score of seven on the Static 2002R also placed him in the "well above average" category, at 3.6 times more likely to reoffend compared to the average sex offender.

¶ 15    Dr. Wood also considered other risk factors shown in studies to be related to recidivism, but not reflected in the actuarial scores. Factors that elevated respondent's risk above the actuarial scores included his diagnosis of antisocial personality disorder, use of intoxicants during offenses, substance abuse, impulsiveness, recklessness, general social problems, victim-blaming, attitude toward rape, self-regulation problems, and belief that he was at no risk to recidivate. Dr. Wood did

not find any factors that would reduce respondent's risk scores on the actuarial instruments. Age was already accounted for in the score, no medical conditions reduced respondent's risk of reoffending, and he was only in the second phase of a five-phase treatment program at the TDF.

¶ 16 Dr. Wood opined that respondent's mental disorders affected his emotional or volitional capacity and predisposed him to engage in acts of sexual violence. He concluded to a reasonable degree of psychological certainty that respondent's risk of reoffending was substantially probable, that is, much more likely than not. He based this conclusion on his review of the records, the risk assessment tools, and his education, training, and experience. He further concluded that respondent met the criteria to be found an SVP under the Act.

¶ 17 Dr. Arroyo testified that he evaluated respondent in 2010 by reviewing his master file, which included police reports, paperwork from the State's Attorney's office, statements made by respondent and the victims, previous evaluations, medical information, disciplinary history from the TDF, prior mental health evaluations, progress notes, and treatment notes. Respondent declined an interview, which did not hinder Dr. Arroyo's ability to complete the evaluation based on the available records. Dr. Arroyo conducted a risk assessment; determined whether respondent met the criteria for a mental disorder; and wrote a report setting forth the diagnoses, respondent's history of offenses, and patterns of behavior. Dr. Arroyo opined that respondent met the criteria to be committed as an SVP under the Act. In 2014, Dr. Arroyo prepared an addendum to the initial evaluation to reflect changes in the diagnostic manuals. He also reviewed more recent paperwork prior to the hearing.

¶ 18 Dr. Arroyo diagnosed respondent with two qualifying mental disorders under the Act: (1) OSPD nonconsent, in a controlled environment; and (2) antisocial personality disorder. He opined

that both disorders made it substantially probable that respondent would engage in future acts of sexual violence. He further opined that the disorders affected respondent's emotional or volitional capacity and predisposed him to engage in acts of sexual violence, and that respondent met the criteria to be deemed an SVP.

¶ 19 In diagnosing OSPD nonconsent, Dr. Arroyo considered the circumstances underlying respondent's convictions for deviate sexual assault and aggravated criminal sexual assault, as well as respondent's admission that while in prison, he had deviate sexual fantasies and used sexually violent pornography for those fantasies for approximately 25 years. Dr. Arroyo also noted that at the time of his offenses, respondent had access to consenting sexual partners, but still chose to engage in nonconsent behavior. In diagnosing respondent with antisocial personality disorder, Dr. Arroyo considered respondent's pattern of disregarding the rights of other people since age 15.

¶ 20 Dr. Arroyo opined that respondent still suffered from OSPD nonconsent, as it is a chronic, life-long condition that does not resolve without treatment or intervention. Respondent also continued to suffer from antisocial personality disorder, which also would not "go away," but would be expected to result in less antisocial behavior as respondent aged. Respondent's antisocial personality disorder exacerbated his OSPD nonconsent.

¶ 21 Dr. Arroyo conducted a risk assessment for respondent using the Static 99R actuarial instrument. Respondent's score of eight fell in the "well above average" category, the highest category on the instrument. The score indicated that respondent was 7.32 times more likely to reoffend than the average sex offender. In evaluating risk to reoffend, Dr. Arroyo also considered protective and dynamic risk factors. Among the dynamic risk factors that further elevated respondent's risk of reoffending were that respondent committed sexual offenses before and after

age 18, showed a lack of concern for other people, violated conditional release, had not completed treatment, had no long-term emotionally intimate relationships, was impulsive, and had poor problem-solving skills. Dr. Arroyo did not find any protective factors that would have reduced respondent's risk of reoffending.

¶ 22    Defense witness Dr. Lesley Kane, a clinical psychologist, was accepted without objection as an expert in evaluation and risk assessment of sex offenders. She testified that she evaluated respondent in 2013, through an interview and review of records, and prepared reports with her findings in 2013 and 2017. She also reviewed more recent records before trial.

¶ 23    Dr. Kane opined that although respondent had been convicted of sexually violent offenses in 1982 and 1986, he did not satisfy the criteria for commitment as an SVP under the Act. Dr. Kane diagnosed respondent with antisocial personality disorder, as well as alcohol use disorder and cannabis use disorder. She based her diagnosis of antisocial personality disorder on respondent's childhood history of engaging in physical altercations, stealing bicycles and selling their parts, stealing from his mother, and running away, and on his adult history of stealing a vehicle and engaging in disorderly conduct.

¶ 24    Dr. Kane testified that she considered diagnosing respondent with OSPD nonconsent but ruled it out. In coming to this conclusion, she reviewed police reports, records of respondent's behavior in prison and in the TDF, what he told her about the offenses, what contributed to the offending behavior, and his other criminal history. Dr. Kane explained that an OSPD nonconsent diagnosis would be appropriate for someone who had a very difficult time controlling his impulses to have nonconsensual interactions. She concluded that "antisocial factors," including "wanting to rob and steal and overpower people," involvement in a street gang, and drug use, rather than a

paraphilic disorder, led to respondent's sex offenses. Dr. Kane opined that respondent's offenses were more opportunistic than well-planned, and more an indication of antisocial or criminal behavior than a paraphilia.

¶ 25    Dr. Kane conducted a risk assessment for recidivism on respondent using the Static 99R and the Static 2002R actuarial instruments. His score of eight on the Static 99R placed him in the "well above average" risk category, and his score of nine on the Static 2002R placed him in the "above average" risk category. Dr. Kane found four dynamic risk factors that elevated respondent's risk of reoffending: antisocial personality disorder, substance abuse, sexual entitlement, and sexual violence. She found that his age served as a protective factor that decreased his risk. In addition, Dr. Kane opined that respondent's treatment and participation in group activities at the TDF helped reduce his propensity to reoffend. Specifically, he learned how to communicate and cope in a healthy manner, rather than using drugs, and had been able to regulate his emotions. Although he had "a couple little violations," he had not, in general, been acting out aggressively or breaking rules. In addition, his problem-solving behavior and conflict-resolution skills were improved.

¶ 26    Dr. Kane concluded that in her professional opinion, respondent did not suffer from a mental disorder that made it substantially probable that he would engage in an act of sexual violence in the future. She did not believe respondent suffered from paraphilia. In addition, she opined that his antisocial personality disorder was "more in remission," as he was incorporating what he had been learning in treatment into his everyday living. She believed his antisocial personality disorder, if it persisted beyond his release, at most could result in theft or a similar offense, but she did not think it was more than likely that he would engage in sexual violence.

¶ 27    On cross-examination, Dr. Kane acknowledged that respondent's score of eight on the Static 99R indicated he was 7.32 times more likely to reoffend than a typical sex offender, and his score of nine on the Static 2002R indicated he was 6.9 times more likely to reoffend than a typical sex offender. She also acknowledged that an additional factor increasing respondent's risk of recidivism was his stated belief that "he had a zero percent chance of reoffending."

¶ 28    Following closing arguments and instructions, the jury found respondent to be an SVP. The trial court entered judgment on the verdict and subsequently denied respondent's motion for a new trial. After a dispositional hearing, the court ordered respondent committed to DHS for care, control, and treatment in a secure facility. This appeal followed.

¶ 29    On appeal, respondent contends that the State failed to prove him guilty beyond a reasonable doubt of being an SVP under the Act. He argues that the difference of opinions between the experts who testified in his case is "substantial" and merits reversal.

¶ 30    To establish that respondent was an SVP, the State was required to prove beyond a reasonable doubt that (1) he was convicted of a sexually violent offense, (2) he has a mental disorder, and (3) he is dangerous to others because his mental disorder creates a "substantial probability" he will engage in acts of sexual violence. 725 ILCS 207/15(b)(1)(A), (B), (b)(4), (b)(5) (West 2016). A "mental disorder," as defined by the Act, is "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2016). While our supreme court has not given us guidance as to "what sort of factual predicate suffices to establish the presence of a mental disorder" (*In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 36), when determining whether the State has met its burden, this court routinely relies on expert testimony and defers to

the factfinder's determinations regarding an expert's credibility (*In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 41).

¶ 31    Here, it is undisputed that respondent was convicted of a sexually violent offense. In contending that he was not proved guilty of being an SVP beyond a reasonable doubt, he appears to claim that the State failed to prove the second and third elements, that is, that he has a mental disorder that makes it substantially probable he would engage in future acts of sexual violence.

¶ 32    When reviewing claims challenging the sufficiency of the evidence to prove that a respondent is an SVP, we view the evidence in the light most favorable to the State and consider whether any rational trier of fact could find that the elements were proved beyond a reasonable doubt. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. We will not reverse a trier of fact's SVP determination unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt. *Evans*, 2021 IL App (1st) 192293, ¶ 42. It is not our role to substitute our judgment for that of the trier of fact regarding the credibility of the witnesses or the weight to be given the evidence. *Id.*

¶ 33    We find that the evidence, viewed in the light most favorable to the State, was sufficient to prove that respondent met the statutory criteria to be deemed an SVP.

¶ 34    As to the mental-disorder element, Drs. Wood and Arroyo both diagnosed respondent with OSPD nonconsent and antisocial personality disorder. In support of the OSPD diagnosis, they testified to respondent's history of sexually assaulting nonconsenting victims, even when he had the option to engage in sexual activity with consenting partners; his years of fantasizing about nonconsensual sexual activity; and his years of viewing sexually violent pornography. Drs. Wood and Arroyo also diagnosed respondent with antisocial personality disorder, which was supported

by respondent's criminal history and pattern of behavior disregarding the rights or welfare of others. Drs. Wood and Arroyo testified that these disorders affected respondent's emotional or volitional capacity and predisposed him to engage in acts of sexual violence. They also opined that respondent's antisocial personality disorder interacted with or exacerbated his OSPD nonconsent.

¶ 35    With regard to the substantial-probability element, we find that the State's evidence was sufficient to prove that respondent's mental disorders made it substantially probable that he would reoffend by engaging in future acts of sexual violence. Both Drs. Wood and Arroyo testified that this was the case, and supported their conclusions with explanations of their risk assessments. They agreed that respondent's score of eight on the Static 99R actuarial instrument placed him in the highest risk category, at approximately seven times more likely to reoffend than the average sex offender, and Dr. Wood testified that respondent's score of seven on the Static 2002R also placed him in the "well above average" risk category. Drs. Wood and Arroyo identified various dynamic factors that increased respondent's risk of recidivism above the actuarial baseline, including his impulsiveness, recklessness, victim-blaming, attitude toward rape, and lack of social skills. Neither Dr. Wood nor Dr. Arroyo found any protective factors that lowered respondent's risk of reoffending.

¶ 36    We decline respondent's request that we reverse the jury's verdict based on Dr. Kane's opinion that he did not suffer from a mental disorder creating a substantial probability that he would commit sexually violent crimes in the future. Dr. Kane's opinion differed from that of Drs. Wood and Arroyo, who both concluded he is substantially probable to reoffend. As respondent observes in his brief, the mere existence of a difference between expert opinions does not warrant overturning a jury's finding in an SVP case. See *In re Commitment of Trulock*, 2012 IL App (3d)

110550, ¶ 50. We defer to the finder of fact on expert credibility and will not reweigh conflicting expert testimony. *Evans*, 2021 IL App (1st) 192293, ¶ 67. Respondent's appeal fails because he asks us to do just that. See *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 50.

¶ 37　Moreover, while respondent was not convicted of additional sexual offenses while in custody, evidence showed that he regularly fantasized about nonconsensual sexual activity, viewed sexually violent pornography, and objectified TDF personnel. "This court has affirmed sexually violent person adjudications despite the absence of previous diagnoses or sexually overt acts in the controlled environment of a prison." *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 60. Here, taking the evidence in the light most favorable to the State, a rational factfinder could find beyond a reasonable doubt that respondent had been convicted of a sexually violent offense, that he had a mental disorder, and that the disorder created a substantial probability that he will engage in future acts of sexual violence. The evidence was not so improbable or unsatisfactory as to leave a reasonable doubt that respondent was an SVP. See *Trulock*, 2012 IL App (3d) 110550, ¶ 50. Accordingly, we affirm the judgment of the circuit court.

¶ 38　Affirmed.