NOTICE
Decision filed 08/13/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240685-U

NO. 5-24-0685

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* COMMITMENT OF DANNY SCHWAB | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 10-MR-35 |
| v. | ) | |
| | ) | |
| Danny Schwab, | ) | Honorable |
| | ) | Elaine L. LeChien, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice McHaney and Justice Boie concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm respondent's civil commitment as a sexually violent person where sufficient evidence was submitted at the trial to support the judgment and the trial court's order of commitment considered the proper factors.

¶ 2   Respondent, Danny Schwab, appeals the trial court's December 19, 2023, commitment order requiring institutional care in a secure facility. On appeal, respondent argues that the State failed to prove beyond a reasonable doubt that he was likely to engage in future acts of sexual violence and the court's order of commitment was erroneous based on a failure to consider factors under section 40(b)(2) of the Sexually Violent Persons Commitment Act (725 ILCS 207/40(b)(4) (West 2022)). For the following reasons, we affirm the decision.

1

¶ 3                                    I. BACKGROUND

¶ 4      In March 2000, respondent was charged with two counts of aggravated criminal sexual assault in violation of section 12-14 of the Criminal Code of 1961 (720 ILCS 5/12-14 (West 2000)), involving two boys under the age of 13, when respondent placed his mouth on their penises. On August 8, 2002, respondent pled guilty to both counts and was sentenced to 14 years' incarceration for one count and 13 years' incarceration for the other with the sentences to run consecutively. The statement of facts related to the offenses revealed that the victims were 10 and 12 years of age at the time of the incidents.

¶ 5      On February 17, 2010, the State filed a petition for sexually violent person commitment pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2010)). The petition alleged that respondent was scheduled for mandatory supervised release on February 28, 2010, and was evaluated by clinical psychologist M. Bellew-Smith. The State alleged respondent was dangerous to others because he suffered from mental disorders that made him substantially probable to engage in acts of sexual violence in the future. Copies of the criminal information and plea along with Dr. Bellew-Smith's report were attached to the petition.

¶ 6      An initial order of commitment was entered on February 19, 2010, after respondent waived the probable cause hearing. A signed copy of respondent's waiver was filed the same day. The court also ordered respondent to be transferred to the control, care, and custody of the Illinois Department of Human Services (DHS) upon completion of his sentence and further ordered an evaluation by DHS.

¶ 7      On April 15, 2010, Dr. Steven Gaskell attempted to conduct a DHS evaluation of respondent, but respondent refused to cooperate or participate in the interview. Due to respondent's lack of cooperation, on June 22, 2010, the State moved pursuant to section 30(c) of the Act (*id.*

§ 30(c)) and *In re Detention of Trevino*, 317 Ill. App. 3d 324 (2000), to prohibit respondent's expert from conducting a personal interview. On June 22, 2010, respondent moved for the appointment of an expert. The motions were argued and taken under advisement. The parties later requested the court stay its ruling until respondent had an opportunity to submit for an interview with Dr. Gaskell.

¶ 8    On January 10, 2011, the trial court issued an order finding that respondent did not submit to an interview with Dr. Gaskell. The court's order allowed respondent to obtain his own expert, but only after he submitted to an interview with Dr. Gaskell. The court stayed any further ruling on the State's motion until respondent had "this final opportunity to submit to an interview with Dr. Gaskell." The physician was ordered to attempt to interview respondent and provide a supplemental report.

¶ 9    On March 21, 2011, the trial court issued an order finding that respondent refused to submit to an interview with DHS expert, Dr. Gaskell, notwithstanding the court's prior orders of October 26, 2010, and January 10, 2011. The court further granted the State's motion to prohibit respondent's expert from conducting an interview with respondent. Therefore, respondent's expert was limited to a record review pursuant to section 30(c) of the Act (725 ILCS 207/30(c) (West 2010)) and was not allowed to conduct an interview with respondent.

¶ 10    On May 23, 2011, respondent moved for a substitution of judge. The motion was heard on May 1, 2014. Following the hearing, Judge Rudolf denied the motion and Judge McGlynn remained assigned to the case. On November 10, 2014, an order was issued following a status conference that revealed respondent now agreed to be interviewed by Dr. Gaskell and the trial court's January 10, 2011, and March 21, 2011, rulings were revised to allow respondent's expert

to interview respondent as long as respondent complied with the order. The order noted that no expert had been appointed for respondent at that time.

¶ 11 Dr. Gaskell's interview was performed on June 25, 2015. On August 18, 2015, Dr. Louis Rosell was appointed to evaluate respondent. On August 24, 2015, the State moved to update Dr. Bellew-Smith's evaluation. On September 15, 2015, the trial court issued an order finding that respondent was still awaiting evaluation by Dr. Rosell. The order also granted the State's motion and allowed Dr. Bellew-Smith to update her initial evaluation from 2010.

¶ 12 On November 15, 2016, the State moved for a new Illinois Department of Corrections (IDOC) evaluator due to the impending retirement of Dr. Bellew-Smith. Following a hearing on November 30, 2016, the court issued an order granting the State's motion for a new IDOC evaluator. On December 13, 2016, the trial court issued an order naming Dr. Weldon-Padera as respondent's replacement IDOC evaluator. On January 9, 2017, the State filed Dr. Weldon-Padera's report.

¶ 13 Dr. Weldon-Padera's report was based on a 3½-hour interview with respondent on December 19, 2016, her review of the other reports, the IDOC master and medical files, the DHS file, and criminal records in St. Clair and Madison Counties. She opined that respondent's diagnoses were: (1) paraphilic disorder, nonexclusive type, sexually attached to males; (2) other specified paraphilic disorder, sexually aroused by nonconsenting males; and (3) other specified personality disorder, antisocial personality traits. Dr. Weldon-Padera noted respondent's scores on the Static-99R and Static-2002R both of which scored "well above average." She concluded that there was "significant evidence that [respondent] has serious difficulty controlling his sexual behavior as a result of his mental disorders" and was a "considerable and continuing risk for sexual offense recidivism." She concluded by opining "that there is a substantial probability [respondent]

4

will engage in acts of sexual violence in the future unless some clinical intervention in a controlled environment has taken place" and therefore, recommended civil commitment.

¶ 14    On February 6, 2017, the State filed supplemental discovery consisting of Dr. Gaskell's updated psychological examination report dated January 20, 2017. He noted at least 20 counts of aggravated criminal assault involving different persons and diagnosed the same mental conditions as Dr. Weldon-Padera. He opined those diagnoses predisposed respondent to engage in acts of sexual violence. However, in addition to his mental disorders, respondent was also in the "highest risk category" that made it "substantially probable to engage in acts of sexual violence." Dr. Gaskell opined that respondent should be found to be a sexually violent person under the Act. In the meantime, respondent obtained Dr. Louis Rosell as his expert.[1]

¶ 15    On April 16, 2018, the State filed an amended petition for sexually violent person commitment to include the diagnoses of Dr. Weldon-Padera and Dr. Gaskell. Thereafter, respondent requested an updated report from Dr. Rosell, which was not received until after COVID shut down the courts in 2020. On January 27, 2022, the court issued an order allowing for updated reports from Dr. Rosell, Dr. Weldon-Padera, and Dr. Gaskell.

¶ 16    Jury selection was held on June 5, 2023. The case proceeded to trial on June 6, 2023. Dr. Weldon-Padera testified that she was a clinical psychologist and licensed sex offender evaluator. After addressing her education and employment, she addressed the three criteria for someone to be a sexually violent person. She explained that the person must have been convicted of an eligible offense, suffered from a mental disorder, and had a substantial probability of committing future acts of sexual violence. She further testified that respondent's case was reassigned to her in December 2016, after respondent was found to be a sexually violent person by the prior evaluator.

---

[1]None of Dr. Rosell's reports are found in the record.

In making her own opinion, she reviews all the records, meets with the person, and completes a risk assessment. She interviewed respondent for 3½ hours on December 19, 2016. Her first report was dated December 29, 2016, and she issued two updated reports dated September 9, 2019, and May 25, 2023. All three reports were admitted into the record without objection.

¶ 17    Dr. Weldon-Padera stated that a person's criminal history was relevant because research showed that a history of sex offending was an important factor in determining sexual recidivism and reoffending. She addressed respondent's criminal history including seven counts of deviant sexual assault in the first degree in 1988. That case involved three males who were 14 to 15 years old. The first victim was sexually abused on six different occasions that included forced oral sex on the victim, simulated sex, masturbation, and attempted anal sex. The second victim involved oral sex on the victim. The third victim involved two occurrences of respondent performing oral sex on him. Dr. Weldon-Padera stated that when respondent was asked about these incidents, he stated they involved oral sex only and only included two of the three victims.

¶ 18    Dr. Weldon-Padera stated that in 1996, respondent was charged with two counts of predatory criminal sexual abuse of a child and 19 counts of aggravated criminal assault. The two predatory criminal sexual abuse counts were later reversed on appeal and were the basis of the charges in 2000 to which respondent pled guilty and was sentenced to 13 years in IDOC on count I and 14 years on count II. She stated that the 1996 charges involved 21 different boys aged 8 to 16. Respondent was 27 when those incidents began and 29 when they ended. She further testified that respondent performed oral sex on 15 of the boys, fondled the penises of 5 of the boys, and most of the acts occurred multiple times with each boy. The various acts included hugging and kissing them, rubbing their chest and body, showing them pornography, his own masturbation, and attempted or actual anal sex. She testified that the acts would occur when the victims were

6

intoxicated, unconscious, or asleep, and respondent would lock the door to keep the victims in his apartment. He would use the prior victims to obtain new victims and would start by buying them food or giving them small gifts. She stated that he would also repeatedly stalk the boys by constantly calling them or showing up at their homes and some of the victims relayed that respondent would just grab their penises without even asking. Dr. Weldon-Padera confirmed that some of the victims' stories were corroborated by respondent's roommate, the owner of a coffee shop that was a popular teenage hangout, and one of the victims' mothers. He would tell the victims that he was in high school so they would not know his actual age. Respondent told the police that he did not do anything wrong because he cared about the boys and believed it was a freedom of choice issue regardless of the victim's age. A search following respondent's arrest found respondent's backpack that had 20 skull rings that he would hand out, pornographic movies and magazines, a bottle of edible cherry-flavored sex lubricant, a bottle of hydrogen peroxide, a roll of scotch tape, a bag of disposable gloves, a paring knife, and a BB gun. When Dr. Weldon-Padera discussed these incidents with respondent, he did not give any specific details, addressed the victims with vague comments, and called them one-time encounters. He did admit to performing oral sex on the victims.

¶ 19    Dr. Weldon-Padera also addressed the charges from 2000 that involved similar circumstances in which the victim, a 13-year-old boy, was stalked and did not want respondent's attention. Respondent took him to his apartment, showed him a pornographic movie, fondled his own penis, removed the victim's clothes, and then masturbated and performed oral sex on the victim who was too scared to stop respondent.

¶ 20    Dr. Weldon-Padera also considered respondent's behavior while on probation for his 1988 conviction. Eight months into that term, respondent violated probation by failing to report that he

7

quit his job and failed to attend court-mandated psychiatric counseling. The probation was revoked a month later after he was charged with disturbing the peace for approaching numerous boys who were 12 to 13 years old, following them, and sexually harassing them.

¶ 21    Dr. Weldon-Padera also considered respondent's non-sexual criminal history as well as his rule violations while incarcerated. She noted 10 rule violations while respondent was in IDOC, including one for sexual misconduct in 2014 when he engaged in masturbation with another resident. She explained the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) and how it was used to diagnose mental disorders. She diagnosed respondent with three conditions that included: (1) paraphilic disorder, nonexclusive type, sexually attracted to males; (2) unspecified paraphilic disorder, sexually aroused by nonconsenting males; and (3) other specified personality disorder with antisocial personality traits. All three of those conditions qualified as mental disorders under the Illinois Sexually Violent Persons Commitment Act, which meant they were all conditions that were predisposed to commit acts of sexual violence.

¶ 22    She stated that paraphilic disorder had three criteria: (1) a person has recurrent, intense sexual fantasies, sexual urges, or sexual activity with prepubescent children over a period of at least six months; (2) a person has either acted on those urges and fantasies or the urges and fantasies caused the person distress or interpersonal problems; and (3) the person has to be at least 15 years of age and at least 5 years older than the prepubescent children at the time of the behavior. Respondent's behavior involved six prepubescent males who were 8 to 13 years old when respondent was between the ages of 27 and 29 years old. The probation revocation also involved prepubescent children. The second paraphilic disorder condition involved the same criteria but, since it was not one of the already listed eight categories, was "other" and involved arousal by nonconsenting males. In this case, respondent maintained sexual arousal despite the victims

displaying distress or rejecting his advances. He would also provide drugs or alcohol to the victims to lower their inhibitions or simply take advantage of their intoxicated state.

¶ 23     Dr. Weldon-Padera stated that the third diagnosis of antisocial personality traits was shown by a persuasive pattern of disregarding rules and other people's rights. This was evidenced by his failure to conform to social norms, deceitfulness, reckless disregard for other's safety, and consistent irresponsibility. This worked hand in hand with the paraphilic disorder because he did not care about his sexual abuse and assault of nonconsenting male children. All of the conditions were long-term chronic disorders that required treatment because they were so deeply ingrained. She did not find it relevant that respondent had not sexually offended anyone since 1996 because he was incarcerated thereafter. He "clearly couldn't control" his actions when he was in the community, even when he was in treatment, as evidenced by his revoked probation. There are no children and teens walking around free in IDOC or DHS.

¶ 24     Dr. Weldon-Padera also addressed the risk assessment tools that included the Static-99R and the Static-2002R. Those were the two instruments used to determine sexual risk recidivism in adult male sex offenders. The Static-99R had a score range of negative 3 to 12. Respondent scored a 6, which placed him in the highest risk category to sexually reoffend which was called "well above average." Respondent's score put him in the top 94.2 percentile, which meant only 4 individuals out of 100 had a higher score, and equated to have a sexual recidivism rate that made him 3.77 times more likely to reoffend than the average sex offender. The score was also linked to a 44.5% likelihood that he would be reconvicted within 20 years if he were released. As for the Static-2002R, it had the same scoring range, and on that instrument, respondent scored an 8, which also placed him in the highest risk category to sexually reoffend. Only 2.8 individuals out of 100 would have a higher score. His score equated to a sexual recidivism rate that was five times higher

9

than the average sex offender and was linked to a 51.9% risk of being reconvicted of another sexual offense within 20 years of his release.

¶ 25    Dr. Weldon-Padera also used the Stable-2007 risk assessment tool which also helped predict sexual recidivism and assess treatment needs. This tool had a scoring range of 0-26, and respondent scored a 13, which placed him in the high-risk category to sexually reoffend. Considering all three tools revealed respondent was in the high-risk category and was high priority for needing supervision, security, and some form of treatment intervention. She explained that respondent's dynamic risk factor of Machiavellianism applied because he viewed it as appropriate to manipulate and take advantage of others, so he believed it was acceptable to engage in that type of behavior. The three protective factors that included being out in a community for a significant period of time, having 15 years left to live due to age or medical conditions, and successful completion of sex offender specific treatment program did not apply to respondent. She noted that respondent's probation was revoked, in part, because he did not attend court-mandated psychiatric counseling and that while respondent transferred to a prison with a sex offender treatment program, he declined to participate in the program. She stated that respondent was currently participating in treatment and was in phase two of a five-phase program. She noted that it was not uncommon to remain in phase two for over a decade. She further noted that respondent did not fully accept responsibility to where he could process the difference between consensual and nonconsensual acts. As of 2022, respondent still had thoughts about teenage males. She did not believe respondent's current treatment lowered his risks of reoffending.

¶ 26    On cross-examination, Dr. Weldon-Padera stated she last spoke to respondent in 2016. She agreed that respondent disputed the allegations against him. She agreed that sometimes a respondent will not admit the charges because they did not want to get into more legal trouble, or

they felt guilty about their prior acts. She agreed that 18-year-old men were in the correctional facilities and there was no indication that respondent was charged with violating against another inmate or at the transitional facility where he had been housed for 15 years.

¶ 27 Following a lunch break, the State called Dr. Steven Gaskell, a forensic psychologist and licensed sex offender evaluator, to testify. After addressing his education and employment, he explained that the statutory criteria for a sexually violent person was someone with a mental disorder that predisposed them to commit future acts of sexual violence, and the mental disorder had to make the person substantially probable to engage in future acts of sexual violence. Dr. Gaskell was assigned to respondent's case in 2010 to determine whether he met the criteria to be a sexually violent person. At that time, his report was based on a record review because respondent declined to participate in an interview. In 2010, he opined that respondent met the criteria to be a sexually violent person. After three other declined interviews, Dr. Gaskell interviewed respondent in 2015. He provided updated reports in 2011, 2015, 2017, 2019, and 2023. After his 2015 interview, Dr. Gaskell continued to opine that respondent was a sexually violent person and that opinion remained the same through April 26, 2023. He believed that respondent's criminal history was relevant to the issue and stated respondent's sexual offenses began around 1985. The victim was 14 or 15 at the time and respondent used manipulation, grooming, and persistence to overcome the child's resistance and performed oral sex on that boy. The sexual acts for the second victim, who was 15 years of age or less at the time, was equally manipulative and involved respondent performing oral sex on the victim, having the victim masturbate him, and an attempted anal sex. The third victim was also 15 years of age or less and respondent performed oral sex on him.

¶ 28 Dr. Gaskell noted that respondent received two years' probation for the offenses and violated probation in 1989. He quit his job and was not attending therapy. He was allowed to

11

remain on probation but was ordered to start therapy. He had a second violation in September 1989, and it was noted that for a three-week period, respondent approached numerous 12- to 13-year-old males wanting to teach them how to masturbate. Thereafter, his probation was revoked, and he was ordered to serve 180 days in jail.

¶ 29 Dr. Gaskell then addressed the 1996 criminal case from Madison County that involved 21 different victims between the ages of 8 and 17, the acts respondent performed, the alcohol and drugs given to the victims, and the lack of consent from the victims. The testimony was similar to that of Dr. Weldon-Padera. Dr. Gaskell also addressed respondent's initial 40-year sentence for the 21 counts but noted that the case was reversed and remanded which resulted in the 13-year and 14-year sentences issued in the 2000 case, thereby reducing the sentence from 40 years to 27 years.

¶ 30 Dr. Gaskell spoke with respondent during his interview and stated that while respondent admitted to some of the behaviors, he minimized the use of force and did not take full accountability for the behaviors. Dr. Gaskell stated that all of respondent's charges were sexually violent offenses under the Act. Dr. Gaskell diagnosed respondent under the DSM-5, and the DSM-5-TR, with the same conditions as Dr. Weldon-Padera, which were: (1) other specified paraphilic disorder, sexually attracted but non consenting persons, nonexclusive type; (2) paraphilic disorder, sexually attracted to males, nonexclusive type; and (3) other specified personality disorder with antisocial traits. He stated all of the diagnoses were mental disorders in the Act. That meant the condition affected a person's emotional or volitional capacity and predisposed them to commit acts of sexual violence. He explained that paraphilic disorder was an atypical sexual interest that either caused the person distress or satisfaction that involved the harm or risk of harm to others. Dr. Gaskell explained how respondent's use of alcohol and drugs to lower the victim's inhibitions so he could perform unwanted acts was evidence of the diagnosis because the victims were scared

12

and could not do anything about what was happening to them. Not only was respondent offending multiple victims at once, but he was also offending and sharing victims with another adult male sex offender. Dr. Gaskell stated that respondent was attracted to both consenting and nonconsenting persons, but the diagnosis was based on the nonconsenting attraction.

¶ 31 Dr. Gaskell also discussed the antisocial personality traits, finding them evinced by respondent's pervasive pattern and reckless disregard for the safety of others, inconsistent work history, and deceitfulness. He stated that the personality disorder also affected the paraphilic disorders because it made respondent more likely to act upon his sexual deviance. He stated that the conditions were lifelong chronic conditions, noting that respondent still had a problem accepting full responsibility for his behavior and instead relied on victim blaming and justification for his behaviors as shown by the progress notes at the treatment detention facility.

¶ 32 Dr. Gaskell agreed that respondent had not sexually offended anyone since 1996, but noted that since that time, respondent was incarcerated or in the treatment detention facility and did not have access to children or adolescents. He did have one sexual misconduct violation which involved him masturbating another resident but there was no indication of nonconsent for that violation. Dr. Gaskell also noted that respondent admitted he still had thoughts of minors but claimed he was able to control the thoughts. However, Dr. Gaskell did not believe respondent had that skill because he was still in the earliest phase of treatment and still had not taken full accountability for his behaviors, both of which were necessary before he could reduce his level of risk. Dr. Gaskell opined that respondent was predisposed to commit acts of sexual violence because of his mental disorders.

¶ 33 Dr. Gaskell also assessed respondent's likelihood of committing future acts of sexual violence using the Static-99R and Static-2002R tools. Respondent scored a 6 on the Static-99R

13

which fell in the highest risk range. Respondent scored a 7 on the Static-2002-R which was also the highest risk range. Both revealed a high risk of recidivism. He also considered risk and protective factors. The risk factors included deviant sexual interest, sexual interest in children, sexual preoccupation, identification with children, attitudes tolerant to sexual offending, any personality disorder, employment instability, noncompliant with supervision, neglect, and emotional and physical abuse. Protective factors included age, health status, and progress in sex offense specific treatment which required completion. Therefore, none of the protective factors were applicable to respondent. He started treatment in 2016 but had treatment interfering behaviors that would require him to leave a group and go into a different group so he could work on barriers to treatment. He also recently got back into treatment in 2022 but remained at the early stage.

¶ 34   Dr. Gaskell opined that it was substantially probable that respondent would commit future acts of sexual violence. He also opined that respondent suffered from mental disorders defined by the Act, was dangerous because of those disorders, and met the criteria for being a sexually violent person.

¶ 35   On cross-examination, Dr. Gaskell confirmed that he was familiar with the treatment detention facility and its five phases of treatment. Respondent was in phase two; however, phase one was the extensive evaluation, so phase two was the first phase of treatment. He agreed that phase two was the most difficult phase. He agreed that respondent's sexual polygraph was waived. He stated that respondent provided multiple different versions of the masturbating with the other inmate incident. He agreed that was the most recent sexual offense and it was 13 to 14 years earlier. He stated that respondent's plethysmograph in the treatment detention facility gauged significant arousal for adult male coercive. He agreed that he had not spoken with respondent since 2015. He agreed that the last time respondent blamed the victim was in 2019, or possibly February 2020. He

14

agreed that respondent could be dealing with triggers while he is in the treatment facility since there is access to television, but if respondent was not telling anyone about it, it would not be documented. Dr. Gaskell agreed that no misconduct was reported in the treatment facility. He also agreed that respondent was recently diagnosed with some spectrum of autism. He agreed that the recidivism likelihood did not guarantee it would happen. On redirect, Dr. Gaskell confirmed that respondent continued to blame the victim as late as 2021. Following Dr. Gaskell's testimony, the State rested.

¶ 36    The following day, the trial resumed, and respondent called Dr. Luis Rosell, who was a clinical and forensic psychologist. He addressed his education and employment and admitted that he primarily testified for respondents. He met with respondent in 2015 and 2022, with the second time being virtual, and reviewed treatment records and legal documents addressing his offenses. He noted respondent was voluntarily participating in sex offender treatment, which was not required. He also obtained an associate's degree while he was at the treatment detention facility

¶ 37    Dr. Rosell thought it was most important that respondent accepted his sexuality. He stated that respondent understood that the offending behavior was inappropriate and caused victims to have problems. He had an opportunity over the last 26 years to reflect, become involved in treatment, and had a good understanding of why he engaged in the behaviors, so they did not happen again. He stated that respondent understood that teenagers and children were not interested in older people. He further understood the harm he caused to his victims, that he could not change that, but could ensure that when he got out, it would not happen again. He stated that respondent's behavior started with grooming and therefore he needed to realize grooming behavior and avoid it. In respondent's case, "any interaction with a child or a teenager should never even occur and if he does meet with someone or meets someone and then starts talking to them and starts incurring

15

favor then that's a huge lapse before an actual relapse and so that can't even occur." If he could avoid any interaction, then he did not have to worry about escaping the situation. That was what he was learning in treatment.

¶ 38    Dr. Rosell testified that respondent admitted that he still had fleeting thoughts about children or teenage boys but that did not mean that he was going to act on those thoughts. The thoughts did not mean that he would engage in that behavior because that behavior could be controlled. He stated that it would be odd for respondent to say he did not have those thoughts anymore because they are not likely to go away. It was just about managing and controlling those thoughts. Respondent had not acted out sexually in over 10 years and was housed in a building surrounded by men. He believed that if respondent could control himself around grown men, he could control himself around adolescents.

¶ 39    Dr. Rosell believed respondent had done well in treatment because he was voluntarily participating and interested in helping himself. Respondent was in phase two of a five-phase program. The first phase was evaluation. Phase two was disclosure. Phases three through five were psychiatric work, relapse prevention planning, and release. He agreed with the diagnosis of paraphilic disorder nonspecified based on respondent's history of offending.

¶ 40    He used the Static-99R to evaluate respondent's risk assessment and agreed with the other experts that respondent was in the well above average range with a score of 6. He believed respondent's age would be a protective factor in the future though because the number assigned would decrease with increased age. He further stated that the risk percentages in some states were lower than the ones found in the original norm table. He agreed that respondent was in the high risk/high need group. He agreed that respondent committed a crime that was a sexually violent

16

offense by statute. He also agreed that respondent had a mental disorder, namely, a paraphilic disorder, but disagreed that the condition made it difficult for respondent to control his behavior.

¶ 41    Dr. Rosell opined that respondent was not substantially probable to reoffend. His opinion was based on respondent's 26 years out of the community and the changes he made during that time. He further based it on the fact that respondent had a place to live and support upon release.

¶ 42    On cross-examination, Dr. Rosell discussed that he only testified once on behalf of the State, the costs of his services, and his pending cases. He could not recall if respondent disclosed all of his victims in treatment. Respondent completed nine of the ancillary programs in treatment, three of which were done after 2016. He continued to opine that a lack of interaction would be the simplest technique to control respondent's behavior, and he was no longer young so it would be difficult for him to interact with children. He did not think it was difficult to avoid interaction with adolescents or children. He agreed there were no adolescents at the facility but there were very young-looking people there. He believed that the majority of sex offenders did not reoffend.

¶ 43    Following Dr. Rosell's testimony, the court questioned respondent about his right to testify. Respondent advised the court that he decided not to testify. Following submission of Dr. Rosell's report, respondent rested.

¶ 44    Following deliberations, the jury found respondent was a sexually violent person. The jury was polled and released and on June 7, 2023, the trial court entered judgment finding respondent a sexually violent person. The order found that it lacked sufficient information at that time to make a final disposition determination regarding whether respondent's commitment should be for institutional care in a secure facility or for conditional release and therefore requested predisposition evaluations by a DHS expert and Dr. Rosell.

¶ 45    On July 3, 2023, the court issued an order stating that the parties were awaiting predispositional investigative reports. Dr. Edward Smith's July 21, 2023, report addressed the issue of what was the least restrictive placement for respondent where he could be adequately, effectively, and safely managed and treated. After interviewing respondent, and his records, Dr. Smith opined that the least restrictive environment was in the DHS Treatment and Detention Facility (TDF) in Rushville, Illinois. He noted that respondent remained in phase two of the five-phase treatment. Dr. Smith further opined that respondent's treatment should address the following areas to reduced his substantial risk of re-offending: (1) ongoing assessments for his specific treatment needs; (2) continued motivation to engage in treatment; (3) disclosure of sexual offending history in detail; (4) knowledge of his patterns of reoffending; (5) metacognition and self-awareness to be able to identify when he is in his cycle; (6) ability to intervene in his cycle; (7) ability to change problematic thought patterns; (8) development and use of a support system (9) wellness planning; (10) management of sexual arousal and sexual behavior; and (11) ongoing emotional regulation.

¶ 46    The case proceeded to hearing on November 16, 2023. Testimony was provided by Dr. Smith, Dr. Rosell, and respondent. Dr. Smith testified that he was a licensed sex offender evaluator for the DHS, a licensed clinical psychologist, and a trained sex offender treatment provider. He reviewed respondent's medical and legal records and interviewed respondent. He opined that respondent's most appropriate placement and least restrictive environment was at the DHS TDF in Rushville, Illinois. He stated that the basis of his opinion included the fact that between 1988 and 1996 respondent offended against in excess of 20 males between the ages of 9 and 16 and engaged in a number of sexual offending behaviors including oral sex on the males, fondling, masturbation, and an attempt at anal sex. He also engaged in grooming behaviors including

18

flattering conversation, sexual talk, bribing, using alcohol, and pornography. He stated that past behaviors spoke to an individual's pattern of behavior over time and was a foundation for assessing an individual's risk of reoffending. He also relied on his own diagnoses, which were: (1) pedophilic disorder, sexually attracted to males; (2) other specified paraphilic disorders, attracted to nonconsenting males; and (3) specified personality disorder with antisocial traits, all of which were mental disorders under the Act.

¶ 47    Dr. Smith testified that he also performed a risk assessment using the Static-99R and Static 2002R instruments along with additional factors found to correlate with sexual reoffending as well as protective factors that lowered an individual's risk. Respondent scored a 6 on the Static-99R, well above average risk, which was also the highest risk category on that instrument. Respondent scored an 8 on the Static-2002R, which was also the highest assigned risk category. His additional factors included several deviant sexual interests, lack of cooperation with supervision, history of employment instability, and a lack of appropriate adult consensual relationships. He did not find any protective factors availing for respondent because he had not completed sex offender treatment and he had no medical conditions that would lower the risk. Dr. Smith also addressed the treatment provided to respondent at the TDF. Respondent remained in phase two of five in his treatment program. He did not believe respondent had sufficient treatment that he could be conditionally released given respondent's extensive history of offending, violating probation, failure to attend sex offender treatment while incarcerated, and insufficient foundational treatment knowledge to be released into the community and be safe and successful. He opined that the least restrictive environment for respondent would be the TDF.

¶ 48    Respondent called Dr. Rosell who testified that respondent had been in treatment for over 12 years with a few breaks in between. He looked at the most recent records and used those records

in his report. He thought respondent was doing very well and progressing. Respondent admitted to the past problems and was transparent about the number of victims. He was controlling his behavior by not having relationships with men in the facility. He stated that respondent took responsibility for his past acts and was remorseful. He had no infractions in several years while at the TDF. He did not think the probation violation in 1988 was relevant to respondent's current condition. He believed respondent was near the end of phase two and believed respondent had a very good understanding of why he engaged in his offending behavior many, many years ago. He was out of control when the offenses happened but was now in control of his behavior. If he was receiving conditional release, he would also be available for individual therapy, which Dr. Rosell believed would be good for respondent, and he would also continue with his sex offender treatment. His age was increasing so his risk level would be reducing. He agreed that he never found respondent to be a sexually violent person and further agreed that it was possible that he would never state that respondent needed institutional treatment.

¶ 49    Respondent testified that he was currently in the TDF and had been there for 13 years. He stated he was doing his last bit of cycle work for phase two and believed he would be going to phase three soon. He stated that he completed 30 to 40 of the groups for phase 4. He said his three core schemes were mistrust and abuse, social alienation and isolation, and subjugation. Those things dug deep into what enabled his triggers, his deviant arousal, offending in an inappropriate manner with age groups, and healthy relationships. His last major incident, for which he received a ticket at the TDF, was in 2014. He had a few minor ones including insolence. He tried hard to follow the rules at the TDF even though he disagreed with some of them. He did not think he would have any trouble with the conditional release rules. He stated that he had a support group comprised of family and friends.

20

¶ 50    Following the testimony, both parties provided closing arguments. Thereafter, the court took the matter under advisement. On December 19, 2023, the trial court issued a commitment order finding that institutional care in a secure facility was appropriate. The order noted that the court considered the nature and circumstances of the behavior that was the basis of the allegation in the petition, respondent's mental history and present mental condition, and what arrangements were available to ensure respondent had access to and would participate in necessary treatment.

¶ 51    On January 17, 2024, respondent moved for reconsideration of the court's disposition. In support, respondent argued that the trial court failed to consider the following factors and evidence including: (1) the duration of respondent's time at the TDF, and ability to follow the rules while held at the TDF; (2) the jobs held by respondent while detained at the TDF and his security level based on his conduct at the facility; (3) respondent's commitment to treatment while at the TDF; (4) respondent's ability to articulate and display his knowledge of the treatment (disclosing all previous abusive behaviors, knowing his triggers, knowing his interventions and how to apply them); and (5) the restrictions in place to insure safety while on conditional release. The motion further stated that Dr. Smith admitted that he did not ask respondent certain questions regarding his treatment knowledge and progress.

¶ 52    The motion was argued on March 26, 2024, and the court took the matter under advisement. On April 30, 2024, the trial court issued an order denying the motion and admonished respondent of his appeal rights. Respondent timely appealed.

¶ 53                                    II. ANALYSIS

¶ 54    The Sexually Violent Persons Commitment Act allows the State to extend the incarceration of a convicted defendant beyond the release date when the State shows that the defendant is sexually violent. *In re Detention of Hardin*, 391 Ill. App. 3d 211, 216 (2009). Proceedings under

the Act are civil in nature and are initiated by the State by filing a petition alleging that a particular person was (1) convicted of a sexually violent offense, (2) has a mental disorder, and (3) is dangerous to others because the mental disorder creates a substantial probability that the person will engage in acts of sexual violence in the future. 725 ILCS 207/15(a), (b) (West 2022). Involuntary commitment continues "for control, care and treatment until such time as the person is no longer a sexually violent person." *Id.* § 40(a).

¶ 55    On appeal, respondent first argues that the State failed to prove each element of the case. More specifically, he argues that the State failed to prove beyond a reasonable doubt that respondent suffered from a mental disorder and that he was substantially likely to engage in future acts of sexual violence. When reviewing claims challenging the sufficiency of the evidence, after viewing the evidence in a light most favorable to the State, we consider whether any rational trier of fact could find that the State proved the elements beyond a reasonable doubt. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. It is the jury's responsibility to weigh the credibility of the witnesses and assign weight to the evidence. *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 48. As such, this court will not reverse a jury's sexually violent person determination unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt. *Id.*

¶ 56    A "sexually violent person" is defined as a "person who has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2022). The State's petition must allege that the person (1) has been convicted of a sexually violent offense, (2) has a mental disorder, and (3) is dangerous to others because the mental disorder creates a substantial probability that he or she will engage in acts of sexual

violence. *Id.* § 15(b). At trial, the State must prove the petition's allegations beyond a reasonable doubt. *Id.* § 35(d).

¶ 57 Here, respondent concedes he has been convicted of a sexually violent offense and has a qualifying mental disorder. However, he contends the State failed to prove that he was dangerous to others because his alleged mental disorder failed to create a substantial probability that he would engage in future acts of sexual violence. In support he argues that he is being punished for his past conduct that occurred over 27 years ago. We disagree.

¶ 58 There is no dispute that a defendant cannot be involuntarily committed based on past conduct. *In re Detention of Samuelson*, 189 Ill. 2d 548, 559 (2000). "Involuntary confinement is permissible only where the [respondent] presently suffers from a mental disorder and the disorder creates a substantial probability that he will engage in acts of sexual violence in the future." *Id.* (citing 725 ILCS 207/15 (West 1998)). Here, the evidence submitted came from three experts who reviewed respondent's medical and legal records, interviewed respondent, and provided opinions as to whether respondent would be sexually violent in the future.

¶ 59 Both Drs. Weldon-Padera and Gaskell opined that it was substantially probable that respondent would be sexually violent in the future. Their opinions were based on investigatory tools including the Static-99R and Static-2002R that placed respondent in the highest risk category of recidivism. Further, they both considered factors that would increase or decrease the likelihood of future sexual violence, noting that most factors increased the likelihood of sexual violence and the reducing factors did not apply to respondent. They both testified that respondent's mental health diagnoses were chronic and without substantial treatment would place the public at risk of respondent reoffending. Both doctors also testified about their belief that respondent's antisocial personality disorder affected the paraphilic disorder making him more likely to act upon his sexual

23

deviance. Further, the opinions considered respondent's infractions while incarcerated and while he was in the TDF, the lack of respondent's remorse, his failure to accept responsibility for his actions, and his continued fleeting thoughts of children or adolescent boys.

¶ 60 While Dr. Rosell agreed that respondent's crimes qualified for detention under the Act and also agreed with the diagnoses promulgated by Dr. Weldon-Padera and Dr. Gaskell, he disagreed that respondent was likely to commit further sexual violence, despite similarly scoring respondent on the Static-99R instrument. Instead, he believed that the studies overstated the likelihood of recidivism and further stated that the factors for the recidivism results would decrease based on respondent's age in the near future. He believed respondent was remorseful, accepted sufficient responsibility, and that respondent's fleeting thoughts of male children and adolescents was manageable.

¶ 61 Contrary to respondent's argument, the opinions were not based solely on past actions. Further, it was for the jury to decide which experts it found most credible and the amount of weight to be afforded to their opinions. See *Trulock*, 2012 IL App (3d) 110550, ¶ 48. We find nothing in the evidence submitted by Drs. Weldon-Padera and Gaskell that would cause this court to believe their opinions regarding the likelihood of future sexual violence were so improbable or unsatisfactory that it left reasonable doubt. See *id.* This court will not substitute its judgment for that of the jury's resolution of a dispute between qualified experts. *Id.* ¶ 50. Accordingly, we affirm the trial court's judgment that respondent was a sexually violent person.

¶ 62 Respondent also argues that the trial court erred in committing him to a secure facility. We review the trial court's decision for an abuse of discretion. *Id.* ¶ 52. An abuse of discretion is only found where the decision is arbitrary, fanciful, or unreasonable. *Id.*

24

¶ 63    After a trial, if a respondent is found to be a sexually violent person, he may be committed "until such time as the person is no longer a sexually violent person" or may be eligible for conditional release. See 725 ILCS 207/40(a), (b)(2) (West 2022). The court's order is required to specify which outcome is decided. *Id.* § 40(b)(2). In making its determination, "the court shall consider the nature and circumstances of the behavior that was the basis of the allegation in the petition ***, the person's mental history and present mental condition, and what arrangements are available to ensure that the person has access to and will participate in necessary treatment." *Id.*

¶ 64    While respondent contends the court failed to consider the section 40(b)(2) factors, no evidence to support that contention is presented. He claims the trial court failed to consider respondent's mental health history, present condition, and the testimony of Dr. Rosell and instead focused on the State's expert. We again disagree.

¶ 65    The record reveals that Drs. Scott and Rosell discussed respondent's criminal behavior, his mental history, current mental condition, and arrangements that would most likely assist respondent in receiving the necessary treatment. His present mental health condition was the same as his past. Dr. Scott believed that respondent's best option was continued residence at the TDF where he was receiving sex offender treatment and was currently only in phase two of five in the treatment. Conversely, Dr. Rosell believed respondent should have conditional release and he had learned enough in treatment to suffice for actual completion of the phase three and four levels. Additionally, respondent also provided testimony. Notably, he testified that he "tried hard" to follow the rules at the TDF even though he disagreed with some of them and therefore, he believed he would not have any trouble with the conditional release rules. We also note that while respondent testified of a support group, the closest was in St. Louis, two were in Tennessee, and two others were unnamed and their locations unknown.

¶ 66 Contrary to respondent's contention, we cannot find that the trial court ignored any of the section 40(b)(2) factors. Evidence in the record revealed that respondent had not completed phase two of a five-phase treatment program. His support system was not well documented, and some of their locations were not even provided. Accordingly, we affirm the trial court's order of commitment.

¶ 67                                    III. CONCLUSION

¶ 68 For the above-stated reasons, we affirm the trial court's judgment finding respondent was a sexually violent person and order of commitment.

¶ 69 Affirmed.